194 F.3d 1020 (9th Cir. 1999)
 UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
REAL PROPERTY AT 2659 ROUNDHILL DR., ALAMO, CA, Defendant,
ROBERT FITZSTEPHENS; WILSON YOUNG; KEITH SLIPPER; JOSEPH IPPOLITO; MICHAEL THALER; MARK SCHWAB, Claimants-Appellants,
and
KATHRYN PAYTON; GREGG PAYTON; ANTHONY GREGG PAYTON, Claimants.
 UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
REAL PROPERTY AT 2659 ROUNDHILL DR., ALAMO, CA, Defendant,
WORLD SAVINGS & LOAN ASSOCIATION, Intervenor-Appellant,
 
 No. 98-15836, No. 98-16207
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted May 11, 1999
Filed October 15, 1999
 [Copyrighted Material Omitted]
 Dena R. Thaler, Oakland, California, for the claimants appellants.
 Barry D. Hovis, Hovis, Smith, Larson, Lipscomb & Cross, San Francisco, California, for the intervenor-appellant.
 Robert D. Ward, Assistant United States Attorney, San Francisco, California, for the plaintiff-appellee.
 Appeals from the United States District Court for the Northern District of California; D. Lowell Jensen, District Judge, Presiding. D.C. No. CV-94-03525-DLJ, D.C. No. CV-94-03525-DLJ
 Before: Donald P. Lay,[1] District Judge, Harry Pregerson and Michael Daly Hawkins, Circuit Judges.
 HAWKINS, Circuit Judge:
 
 
 1
 The appellants are claimants (Robert Fitzstephens et al., hereinafter "purchasers") and intervenors (World Savings and Loan Association, hereinafter "World") in an in rem forfeiture suit brought by the government against real property. They appeal the district court's summary judgment order in favor of the government. For the reasons set forth below, we reverse.
 
 I. Facts and Procedural History
 
 2
 In 1990, Anthony and Kathryn Payton purchased real property located at 2659 Roundhill Drive, Alamo, California (hereinafter "the property") for $682,500. The Paytons paid $558,310 and financed the remainder through a loan from World. The loan, which was for $300,000, was secured by a mortgage and deed of trust recorded on January 24, 1993.
 
 
 3
 The government alleges that the Paytons used the proceeds of Anthony Payton's illegal drug trafficking activity, which took place beginning in 1974, to make their down payment on the property. On October 5, 1994, the government filed a complaintfor forfeiture pursuant to 21 U.S.C. S 881(a)(6),[2] naming the real property as the defendant res . On October 19, 1994, the government arrested the property and recorded a notice of lis pendens in the Contra Costa County Recorder's Office.
 
 
 4
 World filed a claim in the forfeiture action asserting an innocent lienholder interest worth $340,000 -the amount owed World by the Paytons, consisting of the $300,000 loan plus interest. The government did not dispute that World had a non-forfeitable $340,000 interest in the property. In settlement negotiations, the government offered to pay off World's interest as soon as the government obtained a judgment of forfeiture and successfully marketed the property. World refused. Instead, as the Paytons had made no loan repayments to World since October of 1993, World began immediate foreclosure proceedings.
 
 
 5
 The Paytons petitioned the court to stay the foreclosure. Both World and the United States opposed the Paytons' motion, and the motion was denied. In February of 1995, the court stayed the foreclosure proceedings because of a pending bankruptcy proceeding against the Paytons, but lifted the stay on April 28, 1995.
 
 
 6
 World sold the property in May of 1995. The value of World's interest at the time was $340,000. According to appraisers, the property's actual value was between $590,000 and $625,000; thus, the Paytons' equity in the property was somewhere between $250,000 and $285,000. World sold the property for $354,000 to six persons (the appellants) who had formed a partnership on the morning of the sale for that purpose. World subsequently withdrew its claim in the forfeiture action, and the purchasers entered theirs. World kept the $340,000 it was owed and placed the remainder of the sale proceeds ($14,000) in interpleader in the Paytons' bankruptcy case.
 
 
 7
 The purchasers and the United States filed cross-motions for summary judgment. The purchasers contended that the government had abandoned the property by consenting to the foreclosure sale. They also claimed that the district court lacked in rem jurisdiction over the Roundhill property because a foreclosure sale extinguishes any claims arising after the purchaser's interest vests, and the interest of a purchaser at foreclosure vests at the time the trustee (in this case, World) recorded its deed of trust. Finally, the purchasers argued that they were "innocent owners" and thus immune from forfeiture proceedings under S 881(a)(6).
 
 
 8
 The district court found that the government's acquiescence in the foreclosure sale did not constitute a release of its forfeiture interest in the property; that the government's interest vested prior to the purchasers' by virtue of 21 U.S.C. S 881(h), the statute's "relation back" provision; and that the purchasers could not qualify as "innocent owners " since the notice of lis pendens was sufficient to alert them to the nature of the property. Based on these findings, the court tentatively awarded summary judgment to the United States. The court ordered the government to submit a proposed judgment along with a statement of how forfeiture would be executed, and invited the purchasers to respond. In its statement, the government suggested that the purchasers might have a cause of action against World. World accordingly petitioned for and received the court's permission to intervene.
 
 
 9
 In 1997, the purchasers, wishing to sell the property, applied to the court for an order of sale. The court acquiesced, ordering that the proceeds be deposited into an interestbearing escrow account subject to the jurisdiction and further order of the district court. The property was sold for $432,363.79.
 
 
 10
 In January of 1998, the court granted summary judgment to the United States for the reasons expressed in its tentative ruling. Since the government was entitled only to the Paytons' interest, and since the Paytons' interest had been defined throughout the proceedings as the value of the property minus World's $340,000 interest, the court found that the government was entitled to $432,363.79 minus $340,000 -approximately $92,000. The purchasers were left with $340,000, or $14,000 less than they had paid for the property. World and the purchasers appeal.
 
 II. Standing
 
 11
 The government claims that the purchasers lack standing because they failed to file timely claims and answers in accordance with Supplemental Rule C(6) of the Rules of Admiralty.[3] That rule provides that claims must be filed within ten days of service of process "or within such additional time as may be allowed by the court," and answers must be filed within twenty days of filing the claim.
 
 
 12
 At least two of the purchasers were served through their attorney on May 22, 1995. At that time, they argued that they were not required to file claims in order to contest the forfeiture. This issue was litigated, and on November 13, 1995, the court held that the purchasers were obligated to file claims and answers in accordance with Rule C(6). Although two purchasers filed claims within ten days of the court's order, the other four did not file claims for several months. Moreover, none of the purchasers filed answers until May of 1996.
 
 
 13
 It is clear that at least some of the purchasers failed to file timely answers in compliance with Rule C(6). While such claimants may be held to lack standing to contest the forfeiture, see, e.g., United States v. $288,914, 722 F. Supp. 267, 270 (E.D. La. 1989), the district court also has discretion to allow late filing. Although a formal extension request is surely envisioned, the district court has "discretion to overlook the failure to conform to the requirements of Rule C(6)." United States v. 2930 Greenleaf Street, 920 F. Supp. 639, 644 (E.D. Penn. 1996). This is what appears to have occurred here, given that the government raised the issue in its motion for summary judgment and the district court chose not to address it. Claimants have standing.
 
 III. Jurisdiction
 
 14
 We next address appellants' argument that, following the foreclosure sale, the district court lacked in rem jurisdiction over Roundhill. In response to this argument, the government asserts that actual possession of the res, while necessary to establish the court's jurisdiction originally, is not necessary for the continuance of jurisdiction. Moreover, under Supplemental Rule E(5) of the Rules of Admiralty, the steps necessary for the release of arrested property were not taken[4].
 
 
 15
 The government is correct that a court does not lose properly acquired jurisdiction over the subject res simply because there is a shift in its control or possession. See Republic Nat'l Bank v. United States, 506 U.S. 80 (1992). As we understand the appellants' argument, however, they do not claim that the court lost jurisdiction over the property because the government no longer controls or possesses it. Rather, they claim that the court lost jurisdiction over the property because the government no longer has a cognizable legal interest in it. As stated in their brief: "While the court retains subject matter jurisdiction over the forfeiture, the real property passes to the foreclosure sale purchaser and the excess sale proceeds become the new res. The real property is no longer involved in the forfeiture."
 
 
 16
 As a jurisdictional claim, the appellants' argument founders on Rule E(5). It is true that the subject matter of a forfeiture action generally shifts to the sales proceeds after foreclosure. Importantly, however, this transaction is effected by an order of the court releasing the real property for foreclosure and declaring the sales proceeds the new res. See, e.g., id., 506 U.S. at 83; United States v. One Single Family Residence Located at 6960 Miaflores Avenue, 932 F.2d 1433, 1434 (11th Cir. 1991). There was no such order in this case.[5]
 
 
 17
 The appellants argue that the district court did the equivalent of ordering the property's release when it denied the Paytons' motion to stay foreclosure, and again later when it released the bankruptcy stay on the foreclosure proceedings. Similarly, they argue that the government consented to the release of the property by joining in World's opposition to the Paytons' motion to stay foreclosure and by failing to obtain its own stay. However, the provisions of Rule E(5) are clear: only an affirmative court order or the government's written stipulation can release the property. Neither occurred here. The court retained jurisdiction.
 
 IV. Abandonment
 
 18
 The appellants claim that the government's "active support" for World's foreclosure sale constituted an abandonment of the real property res. They contend that "the Government must choose to either release the real property for foreclosure and limit its claim to any equity of the wrongdoer, or keep the real property and pay the lienholder off; it may not simultaneously do both." According to the purchasers, the government elected to do the former by joining World in opposing the Paytons' motion for a stay of foreclosure and by failing to take any of the steps available to prevent foreclosure, e.g., moving for a stay or paying off World's loan.
 
 
 19
 The government responds that, since it never actually "seized" the property but merely "arrested " it, it had no right to prevent World from foreclosing.[6] It wasfor this reason that the government joined World in opposing the Paytons' motion for a stay of foreclosure. However, this did not amount to a renunciation of its own interest in the property. Indeed, the government showed its continuing interest in the real property by twice attempting to arrange for future payment of World's loan. Moreover, after World initiated foreclosure, the government issued a letter to World's counsel stating: "This is to advise, if it is not already clear, that the captioned parcel of real property is the subject of pending forfeiture litigation . . . based upon a government complaint for forfeiture filed on October 5, 1994 . . . ." A copy of the forfeiture complaint and the notice of lis pendens were attached.
 
 
 20
 That the government repeated its intention to pursue forfeiture of the real property after World initiated foreclosure disposes of the question of formal abandonment. In the district court's words, the government's actions showed that it "had no intention of voluntarily relinquishing its claim to the property." Property is formally abandoned only if it has been "renounce[d] utterly." United States v. Cretacci, 62 F.3d 307, 311 (9th Cir. 1995). That is clearly not the case here.
 
 
 21
 The appellants argue that, even if the government did not formally abandon the real property, certain of its actions constitute waiver and/or estoppel. By joining World's opposition to the Paytons' motion to stay foreclosure, as well as by failing to bring its own motion to stay the foreclosure,"the Government waived its right to contest the legal effect of [the foreclosure] sale, and is estopped from doing so. " However, the government does not wish to contest or to undo the foreclosure sale or its effects. Rather, the government disagrees with the appellants as to what these effects are. This claim is therefore no more than a procedural restatement of the appellants' substantive arguments, to which we now turn.
 
 V. Relation back
 
 22
 Under California law, when a person purchases property from a trustee in a non-judicial foreclosure proceeding, the purchaser's interest "relates back" to the time the original deed of trust was recorded. See Hohn v. Riverside County Flood Control and Water Conservation Dist., 228 Cal. App. 2d 605, 613 (Cal. Ct. App. 1964). The sale thus serves to extinguish any liens or encumbrances that attached to the real property after the deed of trust. See Homestead Savings v. Darmiento, 230 Cal.App.3d 424, 437 (Cal. Ct. App. 1991); Hohn, 228 Cal. App. 2d at 613. See also Arrow Sand & Gravel, Inc. v. Sunburst Decorative Rock, 38 Cal. 3d 884, 887 (1985) (recorded notice of lis pendens does not vitiate title of purchaser at judicial foreclosure sale). Accordingly, although they did not buy the property until May of 1995, the purchasers in this case took title to Roundhill effective as of January 22, 1993 -before the government initiated forfeiture proceedings.
 
 
 23
 As it happens, the government can also claim the benefit of a relation back provision. The relevant forfeiture statute provides that "[a]ll right, title, and interest in [forfeited] property . . . shall vest in the United States upon commission of the act giving rise to forfeiture under this section." 21 U.S.C. S 881(h). The Paytons' drug trafficking began long before the Paytons bought the Roundhill property. The district court thus found that the government's interest, relating back to the time of the Paytons' drug trafficking, arose before World executed its deed of trust and was therefore not extinguished by the foreclosure sale.
 
 
 24
 The district court failed to observe an important requirement concerning the application of the relation back provision. In United States v. 92 Buena Vista Avenue , 507 U.S. 111 (1993), the Supreme Court held that the relation back provision cannot serve to extinguish the interest of an "innocent owner," since there can be no relation back until there is a judgment of forfeiture, and the adjudication of innocent ownership naturally precedes judgment. Buena Vista , while arising from a very different factual context, thus makes clear that the relation back doctrine cannot be applied before judgment has been entered. See id. at 123-29.
 
 
 25
 The district court held that the purchasers could not benefit from Buena Vista because they were not (according to the court) innocent owners. However, the basis for Buena Vista's holding -the idea that "relation back" does not occur until judgment -has implications for contexts other than innocent ownership. In this case, the government's claim had not yet been adjudicated at the time of the foreclosure sale. According to Buena Vista, then, its interest could not yet have related back to the time of the acts giving rise to the forfeiture claim, and dated back only to the recording of the notice of lis pendens. Since the lis pendens was recorded after World recorded its deed of the trust (the effective date of the purchasers' interest), the government's interest was extinguished by normal operation of California foreclosure law. In so holding, we do not extend Buena Vista; we merely apply its principles in a different context.
 
 VI. Innocent ownership
 
 26
 Although the above issue disposes of the case, we nonetheless address the issue of innocent ownership in order to clarify certain misconceptions of the law evident in the briefs and in the district court's holding.
 
 
 27
 The forfeiture statute contains an exception for property held by "innocent owners." This exception reads: "[N]o property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner." 21 U.S.C. S 881(a)(6). The district court here held that the purchasers could not be innocent owners because they had constructive notice, through the notice of lis pendens, of the forfeiture proceedings.
 
 
 28
 The purchasers argue that the district court erred in reaching the question of innocent ownership, since the government had not made the required threshold showing that the purchasers used illegitimate funds in buying the property. The government correctly points out that the burden lies entirely with the purchasers to establish that they are innocent owners. No threshold showing by the government is required. See United States v. 1980 Red Ferrari, 827 F.2d 477, 478 (9th Cir. 1987) ("The assertion that the burden rests with the government is incorrect . . . . [T]he language [of S 881(a)(6)] on its face makes clear that it is the owner's burden to establish [innocent ownership].").
 
 
 29
 Moreover, the purchasers are incorrect in their assertion that any purchaser who uses legitimate funds is necessarily innocent. They base this claim on certain language in United States v. Real Property Located at 20832 Big Rock Drive, 51 F.3d 1402 (9th Cir. 1995). The court there stated that "it is only after an owner is shown to have purchased with illegitimate assets that the innocent owner defense even becomes an issue," and that "[t]he innocent owner exclusion comes into play only in those situations, admittedly rare, where a purchaser uses drug money to buy an asset, without knowing the illegal source of the money." Id. at 1410. These statements must be placed in context, however. The court was addressing the question of whether a person using illegitimate funds to buy property can ever assert an innocent owner defense. The statementswere intended to highlight the fact that the innocent owner defense is available to owners who used illegitimate funds -not to find per se innocent ownership where the owners used legitimate funds.[7]
 
 
 30
 What matters for the purpose of ascertaining innocent ownership is not whether the funds the purchasers used were legitimate, but whether the purchasers knew of or consented to the Paytons' drug trafficking when they bought the property. See Red Ferrari, 827 F.2d at 478. Most courts apply a standard of actual, rather than constructive, knowledge, with one proviso: an owner cannot deliberately avoid actual knowledge through "willful blindness." See, e.g., United States v. One 1989 Jeep Wagoneer, 976 F.2d 1172 (8th Cir. 1992); United States v. Aleman, 728 F.2d 492 (11th Cir. 1984); United States v. Batencourt, 592 F.2d 916 (5th Cir. 1979). This Circuit, in United States v. Real Property Located at 10936 Oak Run Circle, 9 F.3d 74 (9th Cir. 1993), embraced a standard more similar to one of constructive knowledge. A panel of this court there held that "innocence is incompatible with knowledge that puts the owner on notice that he should inquire further." Id. at 76.
 
 
 31
 The district court, relying on Oak Run Circle , held that the notice of lis pendens imparted knowledge to the purchasers as a matter of law. In fact, however, Oak Run Circle suggests the opposite conclusion. The purchasers in that case "bought" a house from a drug dealer, Edwards, who was romantically involved with their daughter. The house was the subject of forfeiture proceedings for which a lis pendens had been properly recorded. The purchasers paid no money for the house, obtaining it in return for assuming the mortgage and forgiving an $11,000 debt Edwards owed them.
 
 
 32
 The district court granted summary judgment for the government, but a panel of this Court reversed. Despite the strong circumstantial evidence that the purchasers may have known about the property's origins, the court held that"[t]hese and any other factual questions must be resolved in the district court." Id. Not only did the court fail to find that the notice of lis pendens imparted notice as a matter of law; the court did not even mention the lis pendens other than to note its existence, finding it more significant that "the Alexanders were offered what appears to have been a remarkable bargain." Id.
 
 
 33
 It is only reasonable that a notice of lis pendens should not on its own preclude an innocent owner defense. A notice of lis pendens imparts constructive knowledge that the property at issue is the subject of a lawsuit. See Cal. Civ. Proc. Code S 405.24. It does not necessarily impart knowledge of the previous owner's illegal acts. The latter knowledge is, by the express terms of section 881(a)(6), what bars a person from claiming the innocent owner defense. The existence of a notice of lis pendens may well make it more likely that the purchasers knew of the Paytons' activities, but that is a question of fact, not one of law.
 
 VII. Conclusion
 
 34
 Under California law, the appellants' purchase of privately foreclosed property extinguished any claims to that property attaching after the deed of trust was recorded and before the foreclosure sale. The government's sole claim to the property was a lawsuit initiated during that time period. We hold accordingly that the district court erred in holding that the government's interest pre-dated the purchasers'. The judgment of forfeiture is REVERSED.
 
 
 
 Notes:
 
 
 [1]
 Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.
 
 
 [2]
 Section 881(a) states:
 The following shall be subject to forfeiture to the United States and no property right shall exist in them: . . . (6) All moneys, negotiable instruments, securities, or other things of value fur nished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this sub chapter, [and] all proceeds traceable to such an exchange . . . except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.
 
 
 [3]
 In rem forfeitures are conducted in accordance with the Supplemental Rules for Certain Admiralty and Maritime Claims. See, e.g., United States v. One Dairy Farm, Etc., 918 F.2d 310, 311 (1st Cir. 1990).
 
 
 [4]
 Supplemental Rule E(5) states in relevant part:
 Any vessel, cargo, or other property in the custody of the marshal . . . may be released forthwith upon the marshal's acceptance and approval of a stipulation, bond, or other security, signed by the party on whose behalf the property is detained . . . expressly authorizing such release . . . . Otherwise no property in the cus tody of the marshal . . . shall be released without an order of the court . . . .
 
 
 [5]
 The district court probably should have issued such an order. Section 881(a)(6) authorizes forfeiture of property that is "traceable to" illegal drug activity. After the house was repurchased using legitimate funds, it is not clear that the house, rather than those sales proceeds held by the wrongdoer, was forfeitable property. As a panel of this Court stated in United States v. Real Property Located at 20832 Big Rock Drive, 51 F.3d 1402 (9th Cir. 1995):
 Any interest in property purchased with illegitimate assets is for feitable, but any interest purchased with legitimate interests, even the legitimate assets of a drug dealer or someone who knows they are doing business with a drug dealer, is not forfeitable because it is not "proceeds traceable to" a drug transaction.
 Id. at 1411.
 The appellants do not raise the issue of "tracing the res," however, and we do not decide the case on that basis.
 
 
 [6]
 Some courts have held that 28 U.S.C.A. S 2409a(b) precludes mortgagees from foreclosing on property that has been seized by the government. See, e.g., United States v. Parcel of Real Property Known as 708-710 West 9th Street, 715 F. Supp. 1323, 1327 (W.D. Pa. 1989); United States v. Real Property Constituting Approximately Fifty (50) Acres, 703 F. Supp. 1306, 1312 (E.D. Tenn. 1988); United States v. Real Property Titled in the Name of Shashin, Ltd., 680 F. Supp. 332, 335 (D. Haw. 1987). But see In re Newport Savings and Loan Ass'n, 928 F.2d 472, 477-79 (1st Cir. 1991).
 
 
 [7]
 We note, however, that the legitimacy of the purchasers' funds may affect whether the property is forfeitable in the first place. See footnote 5, supra.